REQUESTED BY: Dear Senator:
You have asked for our opinion on a series of bills presently pending in the Legislature concerning limitations upon spending by governmental units. You specifically refer to L.B. 1, L.B. 2, L.B. 4, and L.B. 5, 85th Legislature, First Special Session, 1978. You request that we review these bills for any constitutional problems, as well as any vagueness or ambiguity problems.
We will analyze each of the bills respectively in this letter. As an initial matter, however, we would point out that L.B. 1 and L.B. 5 impose a statutorily enacted budget limitation of seven and five percent on all governmental subdivisions in the State of Nebraska. Certain aspects of that action raise some constitutional questions.
Establishing a uniform budget limit on all subdivisions poses a classification question. The Legislature is free to classify for purposes of legislation except that unreasonable or arbitrary classifications must be avoided. In L.B. 1 and L.B. 5, the question is whether limiting all subdivisions of the state to a stated percentage increase in budgets operates so unevenly as to constitute an unreasonable classification. Similar subdivisions may have different base year budgets. A limitation as envisioned would mandate different budget levels for such units. This may be an unreasonable classification. However, the provisions for a vote of the people to alter this result may alleviate the classification problem. We are not prepared at this point to make a determination as to constitutionality or unconstitutionality. We merely wish to point out the problem.
L.B. 1
L.B. 1, section 1, amends section 77-1355 so as to establish a limit of seven percent on that portion of political subdivisions' budget funded by ad valorem taxes. In section (1)(a), the bill authorizes an increase in the budget limit by the amount of receipts `. . . lost or to be lost' from any state source. We have attempted to discern how a political subdivision loses or may lose receipts from state sources. A subdivision is entitled to money from state sources by statute or constitutional provision. If the entitlement exists, the political subdivision will receive the money. If no entitlement exists, the political subdivision will not receive the money. It appears the bill intends to say that budget limitations may be increased where past payments from state sources to the political subdivisions are reduced from a level previously existing. However, such an action could not be characterized as a `loss' from state sources. If the intention of the Legislature is to allow political subdivisions to make up for revenue previously supplied by the state that will no longer be supplied, we would suggest the use of a different phrase in place of the words `receipts lost or to be lost from any state sources,' such as `the reduction of previous levels of receipts from state sources.'
In section 2, on page 5, the following language appears:
 "The governing body of the political subdivision shall prescribe the form of the ballot to be used at the election, and the proposition appearing on such ballot shall state percentage which is proposed to be substituted
for the percentage limitation imposed by this act. . . ." (Emphasis added).
The use of the phrase `substituted for the percentage limitation imposed by this act,' suggests the possibility that such an election would result in a new permanent limit being imposed. The bill is ambiguous as to whether the new limit imposed by election is to operate permanently or only for one year. It is our understanding that the intention of the Legislature is that it operate for only one budget year. If the intention of the Legislature in enacting this bill is to allow only annual deviations from the general statutory limit by special election, other language should be selected than that pointed out above which would particularly convey such intention of the Legislature.
L.B. 2
L.B. 2 is denominated the Local Option Tax Control Act. It authorizes the voters of political subdivisions to determine that a limitation of its budget funded by ad valorem taxes is required. Section 4 of L.B. 2, in part, provides:
 "When a budget limitation is approved by the voters at a primary or special election held for such purpose, the budget for the year in which taxes will be levied to fund such budget shall, . . . be limited as provided in the petition or resolution and each fiscal year thereafter the budget may be adjusted from the previous year's budget so as not to exceed any limitation provided by the petition or resolution."
The language utilized in section 4 appears to make applicable any budget limitation adopted by the voters at an election to the budget for the year when taxes are to be levied. Most counties generally levy taxes on September 1 of each year to be imposed and collected commencing January 1 of the following year. All counties are on a fiscal year of July 1 to June 30 with the exception of Douglas County which operates on a calendar year, January 1 to December 31. Other subdivisions of government have different fiscal years. School districts' fiscal years commence September 1. The election provided for must be had before August 15 of any year. The limitation on the budget for the year during which the levy is to be made, could affect an already established budget. In some cases, this could occur well into the fiscal year. For instance, in Douglas County over half of the budget year could be gone before an election occurred. This might create substantial difficulties for such subdivisions. This also raises the question of impairment of contracts. Any impairment could be in violation of Article1, section 16, of the Nebraska Constitution. Impairment of contracts would only occur where a contract or contracts existed that required expenditure of an amount in excess of the limit imposed. Such a situation is unlikely to occur since other adjustments normally could be made. Only in an isolated case might the act be invalid.
In the second half of subsection 4 it is provided that any limitation shall also be applicable for the years succeeding the year of adoption. In sections 5 and 6 of the bill, the petition, resolution, and the ballot question submitted to the voters are to provide for a budget limitation in terms of both dollars and percentages over the current budget. As we understand the intent of the bill overall, it is that each year the increase in the budget authorized shall not exceed a fixed percentage. If the limitation is stated in both dollars and percent, the second year dollar limitations will be different than those of the first year using the same percentage increase limitation. That would continue to be true in succeeding years. It should be made clear that the percentage limitation is to be effective on an annual basis and not the dollar limitation, assuming that is the intent of the Legislature.
A similar difficulty arises with respect to the issue to be submitted to the voters. As we understand the intent of L.B. 2, it is to authorize the establishment of a budget increase limitation. The form called for in section 6(2) to be presented to the voters is to state the budget limitation in terms of dollars and percentages over the current budget proposed to be adopted for the succeeding year. To conform to the intent of the bill, section 6(2) should provide that the question submitted to the voters should be: `shall a budget limitation of ___ percentage be adopted.' The voters should also be notified the limitation will be of continuing effect. Some problem would exist in our view if the question were presented to the voters in the form called for under section 6(2), since voters are nowhere informed of the permanence of the limitation. Any statement of a ballot question in terms so misleading or confusing as to render it unlikely that the voters would fully understand the proposition to be voted on could be held to have worked a fraud on the voters and thus be ineffective.
Section 5 also contains confusing language. The last sentence provides that [A]ll such elections shall be held prior to August 15 of the year in which taxes will be levied to fund the budget.' It is unclear whether that section refers to the fiscal year or the calendar year appropriate to the particular subdivision. The apparent intent of the legislation is to hold the election during any calendar year notwithstanding whatever fiscal year may exist for the particular subdivision involved.
Subsection 8 in line 25 provides `. . . the question of exceeding a budget limitation. . . .' This appears to be a drafting error. The word that should be used there is `establishing' rather than `exceeding.'
The final technical difficulty that we find with L.B. 2 is after the establishment of a budget limitation, it is unclear how to alter the limitation previously established. It is unclear that the same procedure utilized in establishing a budget limitation by the voters is also to be followed to alter, revoke or amend the limit. In order to clearly specify the legislative intent, a section should be added which provides a manner of altering, amending or revoking the limitation. While we believe that the bill might be subject to an interpretation to allow the use of the procedures followed in establishing a limitation to revoke, amend or repeal such limitation, it would be preferable that the Legislature clearly specify their intent in this regard.
L.B. 4
L.B. 4 is an act to establish a limitation of five percent on the state General Fund and Building Fund for the 1979-1980 fiscal year. This provision appears to conflict directly with Article III, section 22 of the Constitution. Article III, section 22, in part, provides:
 "Each Legislature shall make appropriation for the expenses of the government. . . ."
This particular piece of legislation is an attempt by this Legislature to limit the constitutional power of the next Legislature to make appropriation for the expenses of government. While the subsequent Legislature could voluntarily honor such an intention to limit expenditures expressed in a bill such as LB. 4, it would have no constitutionally binding effect on the subsequent Legislature. This is especially so since L.B. 4 provides for a budget limitation of five percent on the General and State Building Funds solely for the fiscal year 1979-1980 and no other fiscal year subsequent to that date.
Furthermore, it is interesting to note that a number of appropriations would not be considered in determining whether or not the five percent figure was exceeded. These would include payments as a result of a court decision based on the Constitution of the United States or the State of Nebraska, but would not include decisions based on a statutory law. Also not to be considered are any statutorily mandated aid payments to political subdivisions, such as, school aid, should L.B. 33 survive the referendum vote pending against it; personal property tax relief; homestead relief; or claims against the state.
L.B. 5
L.B. 5, establishes an immediate five percent limitation on political subdivisions' budgets for the fiscal year 1978-1979. In section 1, line 16, the bill provides:
 "No tax shall be levied or an amount budgeted in excess of the limitation contained in this section for the purpose of acquiring buildings, the erection of buildings, or additions to buildings without a majority vote of the qualified electors voting in an election called for such purposes."
As we interpret this section, it prohibits levying taxes to acquire, erect or make additions to buildings without an election. This section directly conflicts with a number of statutes granting such powers to various subdivisions. As such, it attempts to amend existing law without referring to laws amended in the bill. This violates Article III, section14, of the Constitution of the State of Nebraska.
We have some difficulty with section 2. It provides that political subdivisions may increase their budget in excess of the limitation established by L.B. 5 when they have a population increase greater than five percent. The section does not specify the year the increase is to be measured. It may be the calendar year preceding the adoption of the budget, the calendar year in which the budget is adopted, or some other calendar year. A second problem in this section is the direction to the Department of Revenue to adopt rules and regulations. This bill does not clearly delineate standards with which rules and regulations are to comply. The only standards specified are that the estimates must be made annually, they must be made officially, and they must be estimates related to the political subdivision concerned. While these may be sufficient standards, specification of more definite standards would be desirable.
Section 3 requires a four-fifths vote to suspend by resolution the budget limitations provided in sections 1 and 2 of the act. It is our opinion that such a requirement violates the provisions of Article III, section 13, of the Constitution which provides that `No bill shall be passed by the Legislature unless by the assent of the majority of all the members elected. . . .' An argument might be made that this is not in violation of Article III, section 13, in that it is an action by resolution, but we find no constitutional authority to suspend the operation of a bill by the adoption of a resolution by the Legislature. The authority to adopt a resolution, while contemplated by the Constitution, does not include the authority to adopt a resolution suspending an existing law. Laws in existence may only be amended by adopting a bill specifically setting forth the act to be amended and the amendments to be made. Furthermore, action taken under section 3 may well run afoul of Article III, section 18, which prohibits special or local legislation, particularly where an individual subdivision of government is seeking authority to be exempted from the limit established by the bill.
The final problem that we envision with L.B. 5 is that it would be effective for the fiscal years 1978-1979. In certain cases the 1978-1979 fiscal year of some subdivisions of government will have already started by the effective date of the act. To the extent that the limitation would be applicable to any budget already in effect, there may be a problem with impairment of contracts, as under L.B. 2.